UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

EKF DIAGNOSTICS INC., and    §        No.  5:18–CV–195–DAE
SEPARATION TECHNOLOGY INC.,  §
                             §
     Plaintiffs,             §
                             §
vs.                          §
                             §
INTERMOUNTAIN BIOMEDICAL     §
SERVICES INC.,               §
                             §
     Defendant.              §

OMNIBUS ORDER: (1) GRANTING PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION (DKT. # 9); (2) DENYING DEFENDANT'S
MOTION TO DISMISS (DKT. # 14); AND (3) DENYING PLAINTIFFS'
MOTION TO STRIKE (DKT. # 16)

Before the Court are three motions: (1) a Motion for Preliminary

Injunction filed by Plaintiffs EKF Diagnostics Inc. ("EKF") and Separation

Technology Inc. ("STI") (collectively, "Plaintiffs") on March 27, 2018 (Dkt. # 9);

(2) a Motion to Dismiss Plaintiffs' Complaint filed by Defendant Intermountain

Biomedical Services Inc. ("Defendant" or "Intermountain") on April 2, 2018 (Dkt.

# 14); and (3) a Motion to Strike Defendant's Rule 12(b)(6) Motion ("Motion to

Strike") filed by Plaintiffs on April 5, 2018 (Dkt. # 16).

On May 10, 2018, the Court held a hearing on the motions.  At the

hearing, **Michael Anderson, Esq.** represented Plaintiffs and **Joseph Lanza, Esq.**

and **Charles Vethan, Esq.** represented Defendant.  The motions are fully briefed

1

and ripe for review.  After careful consideration of the memoranda and exhibits filed in support of and in opposition to the motions, as well as the arguments advanced at the hearing, the Court—for the reasons that follow—(1) **GRANTS** Plaintiffs' Motion for a Preliminary Injunction (Dkt. # 9); (2) **DENIES** Defendant's Motion to Dismiss (Dkt. # 14); and (3) **DENIES** Plaintiffs' Motion to Strike (Dkt. # 16).

<u>BACKGROUND</u>

I.    <u>Factual Background</u>

A.    <u>The Hematastat-II</u>

This is a trademark infringement case.  Plaintiffs are comprised of two parties: EKF and STI.  "EKF is a medical device manufacturer" that "specializes in developing tests for use in diabetes and anemia diagnosis and management[,]" such as hematocrit centrifuges, which are "used to determine the blood's hematocrit— the ratio of red blood cell volume to the whole blood volume."  (Dkt. # 1-1, Ex. A ¶ 7.)  "STI is a wholly-owned subsidiary of EKF]" that owns Trademark Registration Number 2,478,043, registered on August 14, 2001, for the word mark "Hematastat-II."  (<u>Id.</u> ¶ 9.)  Plaintiffs developed the Hematastat-II hematocrit centrifuge and "have expended considerable time, money, and effort in advertising and promoting the Hematastat-II trademark to plasma collection laboratories and other hematocrit centrifuge customers."  (<u>Id.</u> ¶¶ 8, 11.)

2

Intermountain is in the business of repairing and servicing medical equipment for plasma collection laboratories.  (Dkt. # 9; Dkt. # 9-4, Ex. B ("Smith Dep.,") at 22:1–11; Dkt. # 9-4, Ex. C ("Brian Dep.,") at 22:3–11.)  From 1996 until February 2018, Defendant repaired and/or serviced hematocrit centrifuges manufactured by Plaintiffs, including the Hematastat-II.  (Dkt. # 9 at 7; Smith Dep. at 27:10–15.)  Specifically, Defendant repaired the sliders, lids, hinge caps, upper and lower housings, and motor housings on the Hematastat-II for Defendant's customers.  (Dkt. # 9 at 7; Smith Dep. at 36:5–9.)

Defendant alleges that it "[did] not make or sell Hematastat-II centrifuges [or] sell reconditioned or used Hematastat-II centrifuges."[1]  (Dkt. # 18 at 2.)  Instead, Defendant contends that it only repaired and serviced the hematocrit centrifuges.  (Id.)  In order to complete the repairs on the Hematastat-II, Defendant purchased parts from Plaintiffs.  (Dkt. # 9 at 7; Smith Dep. at 37:1–4.)  However, in late 2016, "Intermountain stopped purchasing all of the parts to repair the hematocrit centrifuges from Plaintiffs."  (Dkt. # 9 at 7; Smith Dep. at 37:5–13.)

---

[1] Defendant also states that it "does not manufacture the parts used to repair the Hematastat-II centrifuges."  (Dkt. # 18 at 2.)  However, the evidence adduced in Plaintiffs' Motion for a Preliminary Injunction and at the hearing on the motion is directly contrary to this statement.  Although Intermountain itself does not manufacture the parts, Intermountain contracts with third parties to produce parts on its behalf.

B.    The Purportedly Infringing Mark

1.    Defendant Orders Labels Bearing Plaintiffs' Mark

Sometime in 2015, Defendant "began purchasing labels with the Hematastat-II trademark" from third party graphics companies, such as Dyna-Graphics and Signarama.  (Dkt. # 9 at 8; Smith Dep. at 46:3–19; Brian Dep. at 27:1–12, 34:13–16.)  By its own admission, Defendant asked the third party graphics companies to "duplicate exactly" the stickers that Plaintiffs affix to the Hematastat-II after production.  (Dkt. # 9 at 8; Brian Dep. at 29:12–25, 30:8–14, 20–25.)  Defendant has ordered over 2,000 labels with the Hematastat-II mark from the third party graphics companies, and it has used two-thirds of the labels on serviced Hematastat-II products.  (Dkt. # 9 at 9; Brian Dep. at 39:21–25, 40:1–2, 43:11–22, 44:14–22, 45:4–13.)

2.    Defendant Affixes Labels to Unoriginal Replacement Parts

In September 2016, Defendant began working with Rider Plastics, a plastics manufacturing company, to produce molds for the upper and lower housings of the hematocrit centrifuges.  (Dkt. # 9 at 12; Smith Dep. at 44:4–12; Brian Dep. at 46:7–25; 47:13–50:25.)  To do so, Defendant digitally scanned and generated 3-D images of the Hematastat-II's upper and lower housings and then sent those images to Rider Plastics to create a mold.  (Dkt. # 9 at 12; Brian Dep. at 46:7–25; 47:13–50:25.)  After Rider Plastics created the mold, Defendant modified

4

the mold according to its own design.  Thereafter, Defendant ordered

approximately 1,000 modified upper and lower housings from Rider Plastics.

(Dkt. # 9 at 13; Brian Dep. at 56:15–59:1.)  Defendant surmises that it has used

about half of the housings that Rider Plastics produced.  (Dkt. # 9 at 13; Brian Dep.

at 58:17–25, 59:1–9.)  According to Plaintiffs, "[a]t no point in time did [they] give

Intermountain authorization to use parts manufactured by a third party other than

Plaintiffs on the Hematastat-II hematocrit centrifuges."  (Dkt. # 9 at 7.)

As part of its repair and servicing business, "Intermountain affixed

labels containing the Hematastat-II mark to the upper and lower housings

manufactured by Rider Plastics and then placed these [ ] parts on the hematocrit

centrifuges."  (Dkt. # 9 at 7–8; Smith Dep., 44:19–25, 45:1–2.)  Defendant

explained that it "contracted with third parties to make the replacement parts"

because Plaintiffs were "discontinuing the Hematastat-II centrifuge, and would

only supply parts for three years."  (Dkt. # 18 at 2.)  Thus, Defendant claims it

made the replacement parts "to protect its own business reputation when customers

had nowhere to turn to repair their broken devices."  (Id. at 3.)

C.    Plaintiffs' Discovery of Defendant's Alleged Trademark Infringement

In late 2017, one of the laboratories that uses the Hematastat-II, CSL

Plasma Inc. ("CSL"), sent a Hematastat-II to Plaintiffs for repair.  (Dkt. # 9 at 5.)

Plaintiffs contend that "[u]pon inspection of the hematocrit centrifuge," it became

clear that the machine "was not a genuine machine manufactured and marked by

Plaintiffs"; instead, the machine contained parts that Plaintiffs had not

manufactured and a mark that had a "slightly different color[ ] and design than

Plaintiffs' Hematastat-II mark[.]"  (Id.)  Additionally, the machine differed from the

Hematastat-II in the following substantive ways:

1. the housing lacked cooling vents in the housing assembly, thus causing the motor to run at an increased temperature . . . ;

2. the lid assembly included six circles not contained in the lid assembly of Plaintiffs' hematocrit centrifuges;

3. there was no manual key release slot on the side that is contained in Plaintiffs' hematocrit centrifuges;

4. there was no membrane switch that is contained in Plaintiffs' hematocrit centrifuges; and

5. the marking and labeling differed slightly from Plaintiffs' hematocrit centrifuges.

(Id.)  The machine otherwise "appeared to contain a genuine motor, wiring, wiring

harnesses, and other genuine internal parts."  (Id. at 6.)  The machine was marked

with the Hematastat-II mark and an "Intermountain Biomedical" label.  (Id.)  Since

discovering the modified hematocrit centrifuge, Plaintiffs have discovered two

additional hematocrit centrifuges containing Defendant's modified parts.  (Id.)

II.   Procedural Background

On February 5, 2018, Plaintiffs filed a consolidated Original Petition,

Application for Temporary Restraining Order, Request for Temporary Injunction,

6

and Request for Permanent Injunction ("Original Petition") in the 451st Judicial District Court of Kendall County, Texas.  (Dkt. # 1-1, Ex. A.)  Plaintiffs' Original Petition asserts three causes of action against Defendant: (1) false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) ("Section 1125(a)"); (2) trademark infringement under the Lanham Act, 15 U.S.C. § 1114 ("Section 1114"); and (3) trademark infringement under Texas common law.  (Id.)

On February 14, 2018, the state court issued a Temporary Restraining Order ("TRO") against Defendant, restraining Defendant "from using the Hematastat-II mark, marks identical to or substantially indistinguishable from the Hematastat-II mark, marks confusingly similar to the Hematastat-II mark, and from using any other trademarks owned by Plaintiffs."  (Dkt. # 1-2, Ex. B.)  Plaintiffs subsequently posted bond.  (Dkt. # 9 at 4.)

On February 27, 2018, before a hearing was held on Plaintiffs' Request for a Preliminary Injunction, Defendant removed the case to this Court based on this Court's federal question jurisdiction.  (Dkt. # 1.)  On March 13, 2018, Defendant filed an Answer to Plaintiffs' Original Petition.  (Dkt. # 8.)  On March 27, 2018, Plaintiffs filed the instant Motion for Preliminary Injunction (Dkt. # 9), which is fully briefed and ripe for review (Dkts. ## 18, 20).

On April 2, 2018, Defendant filed an Amended Answer to Plaintiffs' Original Petition, which also included a Motion to Dismiss.  (Dkt. # 14.)  On April

5, 2018, Plaintiffs moved to strike Defendant's Amended Answer.  (Dkt. # 16.)

Both motions are fully briefed and ripe for disposition.  (Dkts. ## 19, 23, 25, 26.)

On May 10, 2018, the Court held a hearing on Plaintiffs' Motion for

Preliminary Injunction.  At the hearing, pursuant to Defendant's request, the Court

instructed the parties to file supplemental briefing on the nominative fair use

doctrine.  On May 15, 2018, Defendant filed its supplemental brief (Dkt. # 32), and

on May 21, 2018, Plaintiffs filed their supplemental response (Dkt. # 35).

<u>DISCUSSION</u>

As outlined above, there are three motions before this Court:

(1) Plaintiffs' Motion for Preliminary Injunction (Dkt. # 9); (2) Defendant's Motion

to Dismiss (Dkt. # 14), which the Court construes as a Motion for Judgment on the

Pleadings ("Motion for Judgment on the Pleadings); and (3) Plaintiffs' Motion to

Strike Defendant's Motion to Dismiss (Dkt. # 16).  Because the Court construes

Defendant's Motion to Dismiss as a Motion for Judgment on the Pleadings,

Plaintiffs' Motion to Strike is **DENIED**.  (Dkt. # 16.)  Accordingly, the only

motions that remain are Plaintiffs' Motion for Preliminary Injunction (Dkt. # 9)

and Defendant's Motion for Judgment on the Pleadings (Dkt. # 14).  The Court

addresses each motion in turn.

8

I.    <u>Motion for Preliminary Injunction</u>

  A. <u>Legal Standard</u>

   "Rule 65 of the Federal Rules of Civil Procedure governs both preliminary injunctions and temporary restraining orders." <u>Total Safety U.S., Inc. v. Rowland</u>, 13-CV-6109, 2014 WL 793453, at *5 (E.D. La. Feb. 26, 2014); <u>see also</u> Fed. R. Civ. P. 65.  Injunctive relief is an extraordinary remedy that requires the movant to unequivocally show the need for its issuance. <u>Opulent Life Church v. City of Holly Springs, Miss.</u>, 697 F.3d 279, 288 (5th Cir. 2012); <u>Valley v. Rapides Par. Sch. Bd.</u>, 118 F.3d 1047, 1050 (5th Cir. 1997).  "The prerequisites for preliminary injunctive relief are long-established in this circuit." <u>Libertarian Party of Tex. v. Fainter</u>, 741 F.2d 728, 729 (5th Cir. 1984).  A preliminary injunction should not be granted unless the movant demonstrates by a clear showing: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs any harm to the non-movant that may result from the injunction; and (4) that the injunction will not undermine the public interest. <u>Lindsay v. City of San Antonio</u>, 821 F.2d 1103, 1107 (5th Cir. 1987); <u>Valley</u>, 118 F.3d at 1051; <u>see also</u> <u>Glossip v. Gross</u>, 135 S. Ct. 2726, 2737–38 (2015) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest.") (internal citations and quotation marks

omitted).  Accordingly, "[b]ecause a preliminary injunction may only be awarded

upon a clear showing that the plaintiff is entitled to such relief," Barber v. Bryant,

860 F.3d 345, 352 (5th Cir. 2017) (internal quotations and citation omitted), the

"denial of a preliminary injunction will be upheld where the movant has failed [to

sufficiently] establish *any one* of the four criteria."  Black Fire Fighters Ass'n v.

City of Dall., Tex., 905 F.2d 63, 65 (5th Cir. 1990) (emphasis in original).

At the preliminary injunction stage, the procedures in the district court

are less formal, and the district court may rely on otherwise inadmissible evidence,

including hearsay evidence.  Sierra Club, Lone Star Chapter v. F.D.I.C., 992 F.2d

545, 551 (5th Cir. 1993).  However, even when a movant establishes each of the

four requirements described above, the decision whether to grant or deny a

preliminary injunction remains within the court's discretion, and the decision to

grant a preliminary injunction is treated as the exception rather than the rule.  Miss.

Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

B.    Analysis

Plaintiffs seek a preliminary injunction enjoining Defendant from

infringing on the Hematastat-II trademark.  Plaintiffs argue that a preliminary

injunction is necessary to avoid the irreparable harm to their reputation and good

10

will that Plaintiffs claim may result from any confusion or deception among

Hematastat-II consumers and end-users.  (Dkt. # 9.)  Accordingly, Plaintiffs request

an injunction that restrains Defendant "from using the Hematastat-II mark, marks

identical to or substantially indistinguishable from the Hematastat-II mark, and

from using any other trademarks owned by Plaintiffs."  (Id. at 1.)

           1.    Substantial Likelihood of Success on the Merits

To obtain a preliminary injunction, Plaintiffs must first show a

substantial likelihood of success on the merits.  See Lindsay, 821 F.2d at 1107.  "To

assess the likelihood of success on the merits, [courts] look to the 'standard

provided by the substantive law.'"  Janvey v. Alguire, 647 F.3d 585, 596 (5th Cir.

2011) (quoting Roho, Inc. v. Marquis, 902 F.2d 356, 358 (5th Cir. 1990)); see also

Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A Federal Practice

& Procedure § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a

prima facie case but need not show a certainty of winning.") (footnotes omitted).

Here, Plaintiffs assert that there is a substantial likelihood of success

on their claims against Defendant for trademark infringement under the Lanham

Act and Texas common law.  (Dkt. # 9 at 10.)  "The Lanham Act makes liable

'[a]ny person who . . . uses in commerce any word, term, name, symbol, or device,

. . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin,

sponsorship, or approval of his or her goods, service, or commercial activities by

11

another person.'" <u>Paulsson Geophysical Servs., Inc. v. Sigmar</u>, 529 F.3d 303, 310 (5th Cir. 2008) (quoting 15 U.S.C. § 1114).  To prevail on their claim for trademark infringement under the Lanham Act, Plaintiffs must show that: "(1) [they] possess a legally protectable trademark, and (2) [Defendant's] use of this trademark 'creates a likelihood of confusion as to source, affiliation, or sponsorship.'" <u>Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.</u>, 851 F.3d 440, 450 (5th Cir. 2017) (quoting <u>Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.</u>, 783 F.3d 527, 536 (5th Cir. 2015)).  Because "[t]he elements of common law trademark infringement under Texas law are the same as those under the Lanham Act," the Court will consider these claims together.  <u>Id.</u> (quoting <u>Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.</u>, 333 S.W.3d 719, 730 (Tex. App. 2010)).  The Court considers each element of Plaintiffs' trademark infringement claim in turn.

> i.     <u>Possession of a Legally Protectable Trademark</u>

To prevail on their trademark infringement claims, Plaintiffs must first show that they possess a legally protectable trademark.  <u>Id.</u>  "[P]roof of the registration of a mark with the [Patent and Trademark Office ("PTO")] constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services." <u>Amazing Spaces, Inc. v. Metro Mini Storage</u>, 608 F.3d 225, 237 (5th

12

Cir. 2010); see also Streamline Prod. Sys., 851 F.3d at 451 (citing Xtreme Lashes LLC v. Xtended Beauty, Inc., 576 F.3d 221, 232 (5th Cir. 2009)).

Plaintiffs have demonstrated that they own a legally protectable trademark.  Plaintiffs state that they "own all right, title, and interest in the Hematastat-II mark."  (Dkt. # 9 at 11.)  In support of their argument, Plaintiffs have attached to their Motion for Preliminary Injunction the certificate for Trademark Registration Number 2,478,043, trademarking the word "Hematastat-II," which was registered on August 14, 2001.  (Dkt. # 9 at 11; Dkt. # 9-1, Ex. A-1.)  Such proof constitutes sufficient prima facie evidence of Plaintiffs' possession of a legally protectable trademark.  See Amazing Spaces, Inc., 608 F.3d at 237.

Moreover, because the mark has been in continuous use for five consecutive years since the date of its registration and is still used, the mark constitutes an "incontestable" mark.  See 15 U.S.C. § 1065; see also Am. Rice, Inc. v. Producers Rice Mill, Inc., 518 F.3d 321, 330 n.25 (5th Cir. 2008).  An incontestable mark is "conclusive evidence of the validity of the registered mark and of the registration of the mark . . . and of the registrant's exclusive right to use the registered mark in commerce."  15 U.S.C. § 1115(b).  For purposes of considering the likelihood of success on the merits at the preliminary injunction stage, the Court therefore finds that Plaintiffs possess a legally protectable mark.

ii.      Likelihood of Confusion

Plaintiffs contend that Defendant's use of the Hematastat-II mark

creates a likelihood of confusion as to source, affiliation, or sponsorship.  (Dkt. # 9

at 12.)  Defendant, of course, disagrees.  In response, Defendant argues that

Plaintiffs cannot show a likelihood of confusion because Defendant's customers

know that the centrifuges are manufactured by Plaintiffs and only repaired by

Defendant; thus, Defendant argues, there is no confusion as to the source,

affiliation, or sponsorship of the mark.  (Dkt. # 18 at 5.)  Moreover, Defendant

argues that its use of the Hematastat-II mark is proper under the nominative fair

use doctrine.  (Id. at 7–8; Dkt. # 32 at 5–9.)  The Court addresses each argument in

turn.

a.      Digits of Confusion

The paramount question in a trademark infringement action is

"whether one mark is likely to cause confusion with another."  Xtreme Lashes,

576 F.3d at 226.  "Likelihood of confusion is synonymous with a probability of

confusion, which is more than a mere possibility of confusion."  Elvis Presley

Enters., Inc. v. Capece, 141 F.3d 188, 193 (5th Cir. 1998) (citing Blue Bell Bio–

Med. v. Cin–Bad, Inc., 864 F.2d 1253, 1260 (5th Cir. 1989)).  The Fifth Circuit has

provided eight non-exhaustive "digits of confusion" for courts to consider in

determining whether a likelihood of confusion exists: (1) the type of trademark

allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers. Streamline Prod. Sys., 851 F.3d at 453 (internal quotation marks omitted).

When a defendant uses a plaintiff's exact marks, "a thorough analysis of the digits of confusion is unnecessary, and a presumption of confusion exists." Choice Hotels Int'l v. Patel, 940 F. Supp. 2d 532, 540 (S.D. Tex. 2013) (citing Paulsson, 529 F.3d at 310–11); TGI Friday's Inc. v. Great Nw. Rests., Inc., 652 F. Supp. 2d 763, 767 (N.D. Tex. 2009)).  Here, Plaintiffs have provided evidence that demonstrates Defendant is using the exact same mark on the same—albeit modified—product.  (Dkt. # 9 at 12.)  Moreover, Plaintiffs have offered deposition testimony that shows Defendant's agents requested Dyna Graphics and Signarama to "duplicate exactly" the Hematastat-II mark.  (See id. at 8; Brian Dep. at 30:8–14, 20–25, 31:1.)  Defendant does not contest that the competing marks are identical.  Indeed, Defendant's agent, Chad Brian, testified that Defendant provided the words and content of the original Hematastat-II labels to Dyna Graphics and Signarama so that the stickers would be "identical."  (Brian Dep. 29:3–32:22.)

Moreover, in reviewing the competing marks, the Court notes that there is little difference in the overall design and appearance between the two marks.  For example, both marks appear on a blue label with the word "Hematastat-II" written in a sans-serif font.  (See Dkt. # 9-2, Ex. A-2 at 2.)  While Defendant's mark has a slightly different coloring and design than Plaintiffs' mark, the total effect of the mark under the circumstances suggests a similarity of design that is likely to cause confusion among reasonable persons.  See Streamline Prod. Sys., 851 F.3d at 454.  Because the original Hematastat-II mark and the allegedly infringing marks are almost identical, the Court finds that there is a presumption of the likelihood of confusion.  Choice Hotels Int'l, 940 F. Supp. 2d at 540.  Moreover, Defendant has not come forward with sufficient evidence to rebut this presumption.  The Court is thus inclined to find that Plaintiffs have satisfied their burden of showing a likelihood of success on the merits of their trademark infringement claims.

However, before making a determination on Plaintiffs' likelihood of success in showing a likelihood of confusion, the Court turns, as it must, to the determination of whether Defendant's use of the mark was proper under the nominative fair use doctrine.  See Bd. of Supervisors for La. State Univ. Ag. and Mech. Coll. v. Smack Apparel Co., 550 F.3d 462, 481–83 (5th Cir. 2008)

(instructing courts to consider nominative fair use in conjunction with the

likelihood of confusion analysis to avoid lowering the standard for confusion).

b.     <u>Nominative Fair Use Doctrine</u>

The nominative fair use doctrine generally permits a non-mark owner

to use another's trademark in two circumstances: (1) to inform the public what it

has lawfully copied; or (2) "to identify another's goods or services in order to

describe or compare its product to the markholder's product." <u>Id.</u> (citing <u>Pebble</u>

<u>Beach Co. v. Tour 18 I Ltd.</u>, 155 F.3d 526, 545 (5th Cir. 1998), *abrogated on other*

*grounds by* <u>TrafFix Devices, Inc. v. Mktg. Displays, Inc.</u>, 532 U.S. 23, 32–33

(2001)).  However, the nominative fair use doctrine is not without limits.  <u>Id.</u>  To

avail oneself of the nominative fair use doctrine, the defendant "(1) may only use

so much of the mark as necessary to identify the product or service, and (2) may

not do anything that suggests affiliation, sponsorship, or endorsement by the

markholder." <u>Id.</u> at 489.

Defendant claims it is entitled to use Plaintiffs' trademark under the

nominative fair use doctrine.  (Dkt. # 18 at 7–8; Dkt. # 32 at 5–10.)  Specifically,

Defendant argues that "[t]he Mark must be applied to the device in order to notify

the owner of the device, as well as future technicians who service the device, of the

model of the device and its manufacturer."  (Dkt. # 32 at 2.)  Without adding the

Hematastat-II mark to the new or modified centrifuge parts, Defendant contends

17

that technicians would not know "the proper maintenance of the internal components," which requires highly technical specifications that vary slightly between centrifuge manufacturers.  (Id. at 2–4.)  According to Defendant, "[t]he Mark is, therefore, necessary to identify and differentiate the specific nature of Plaintiffs' device" and to ensure that the service technicians properly repair and recertify the centrifuge.  (Id. at 5.)

In support of its argument, Defendant cites to Avery Dennison Corp. v. Acco Brands, Inc., No. 99-CV-1877-DT(MCX), 1999 WL 33117262 (C.D. Cal. Oct. 12, 1999), wherein the court found that the accused infringer, Acco Brands, Inc. ("Acco"), was entitled to use Avery Dennison Corp.'s ("Avery") trademark under the nominative fair use doctrine.  In Avery, Acco designed and sold "self-adhesive labels intended for use with, among other things, laser or ink jet computers," which were comparable to the same kind of labels Avery manufactured.  Id. at *1.  The issue in Avery was whether Acco could permissibly use Avery's trademark on its own labels to describe and compare Avery's product to its own.  Id. at *4.  The court found that Acco used only so much of Avery's trademark as reasonably necessary to identify Avery's labels since Acco used only a plain font and did not use the Avery logo.  Id. at *5.  Moreover, the court noted that Acco did not stylize or color the font in likeness to Avery's trademark, nor did Acco "use anything else that [was not] needed to make the comparison

18

intelligible." Id.  The court also found that Acco's use of Avery's trademark did nothing to suggest that Avery sponsored or endorsed Acco's labels.  Id. at *6.  The court focused on the fact that "Avery's name and SKU marks [were] displayed in a non-stylized black font, near the bottom [of the package,]" and were only included in the phrase "Comparable to,"—thus reading, "Comparable to Avery [SKU Number]." Avery, 1999 WL 33117262, at *6.  Because it was clear that Acco was merely comparing its own products to similar products that Avery manufactured, the court found that nothing on the label packaging "suggest[ed] sponsorship or endorsement by Avery." Id.  "In fact, use of the words 'comparable to' expressly, or at the very least impliedly, signal[ed] that Avery does not sponsor the product." Id. The court therefore found that "no reasonable juror could find that Acco's use of Avery's Trademarks creates confusion as to the source of the product." Id. at *7.

This case, however, is factually distinct from Avery in two principal ways.  First, Defendant uses more of Plaintiffs' trademark than is reasonably necessary.  See Smack Apparel, 550 F.3d at 489.  Defendant contends that it must use Plaintiffs' mark to notify technicians "of the manufacturer and model of the device" for repair and calibration purposes.  (Dkt. # 32 at 6.)  However, it provides no reason for why the identifying label needs to be identical to Plaintiffs' mark. (Id.)  Rather than merely using a plain font as Acco did, Defendant actually ordered labels from third party graphics companies that, by Defendant's own

19

admission, "duplicate[d] exactly" Plaintiffs' trademark.  (Dkt. # 9 at 8; Brian Dep. at 29:12–25, 30:8–14, 20–25.)  Defendant stylized the font and colored the label in likeness to Plaintiffs' trademark.  Contrary to Defendant's argument, this is pointedly distinct from Acco's use of the Avery mark, and instead seems to suggest that Defendant went far beyond what was reasonably necessary in using the Hematastat-II mark.

Second, by using a mark that is nearly identical to Plaintiffs' mark, Defendant makes it appear as though Plaintiffs sponsor or approve of the modifications.  See Smack Apparel, 550 F.3d at 489.  In Avery, the court found that it was clear to a reasonable person that Acco's use of Avery's label was to compare the two products to each other.  Avery, 1999 WL 33117262, at *6.  In this case, however, Defendant's use of the mark seems to suggest more than mere identification, as Plaintiffs maintain.

Plaintiffs argue that Intermountain's sole purpose in using the Hematastat-II mark "is to suggest to customers and end users that the non-genuine parts sold by Intermountain are sponsored and endorsed by Plaintiffs."  (Dkt. # 9 at 7–8; Dkt. # 35 at 10.)  In support, Plaintiffs cite to Defendant's agent, Kendall Smith, who testified that Defendant places unoriginal Hematastat-II labels on the modified centrifuges, in part, "to keep a professional look and image for a mutual benefit to [Plaintiffs] and Intermountain."  (Dkt. # 32-3, Ex. D-3 ¶ 23.)  Such

testimony evinces that the labels are not solely to identify the make and model of the centrifuges, but also serve to keep Plaintiffs affiliated with the modified machine.  Based on the foregoing reasons, the Court finds that Defendant's use of the Hematastat-II mark does not fall within the confines of the nominative fair use doctrine.

iii.     <u>Use in Commerce</u>

Despite Plaintiffs satisfying both elements of their trademark infringement claims, Defendant argues that a preliminary injunction should not issue because Plaintiffs cannot prevail on their trademark infringement claim under the Lanham Act.  Specifically, Defendant argues that Plaintiffs' trademark infringement claim under the Lanham Act fails because, according to Defendant: (1) "the Lanham Act does not prohibit a company from specializing in the repair of trademarked goods"; and (2) Plaintiffs cannot show that the trademark was used in commerce, which Defendant contends is a necessary element under the Lanham Act.  (Dkt. # 18 at 3–4.)  The Court addresses each argument in turn.

First, Defendant cautions the Court that "the Lanham Act does not prohibit a company from specializing in the repair of trademarked goods."  (Dkt. # 18 at 4.)  The Court tends to agree that the Lanham Act does not create a wholesale prohibition against micro-industries that repair trademarked goods.  The Supreme Court held as much in <u>Champion Spark Plug Co. v. Sanders</u>, a seminal

21

opinion on the use of trademarks on used goods, wherein the accused infringer collected genuine used Champion spark plugs, repaired and reconditioned the spark plugs, and then resold the plugs with a label identifying them as "Renewed." 331 U.S. 125, 126 (1947).

The issue in <u>Champion</u> was whether the lower court erred in not requiring the accused infringer to remove Champion's trademark from the repaired and reconditioned spark plugs before it sold them. <u>Id.</u> at 128. The Supreme Court acknowledged that, in some cases, used and repaired goods can be sold under the trademark of the original manufacturer when the public is not at risk of being deceived, so long as the accused infringer attempts to restore "so far as possible" the original condition of the goods and discloses the true nature of the goods, *i.e.*, whether they are "used," "repaired," or "restored." <u>Id.</u> at 129–30. The Supreme Court cautioned, however, that there are limits on maintaining another's trademark on a used or repaired item, explaining that "[c]ases may be imagined where the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, even though the words 'used' or 'repaired' were added." <u>Id.</u> at 129. Thus, contrary to Defendant's argument, in cases where the trademarked good has been repaired or modified, the issue is not whether the Lanham Act applies at all, but instead whether the trademarked

product was repaired or modified to such an extent that it effectively becomes a new product and should be identified as such to protect consumers from confusion.

Second, Defendant next argues that Plaintiffs cannot show use in commerce because the Lanham Act does not "extend trademark protection to cases where a trademarked product has been repaired, rebuilt, or modified at the request of the product's owner."  (Dkt. # 18 at 4.)  At the outset, the Court notes that the Fifth Circuit has not addressed whether "use in commerce" is in fact an element of a plaintiff's prima facie case for trademark infringement under the Lanham Act, see KS Cayton, LLC v. Hobby Lobby Stores, Inc., No. 6:15-CV-655, 2016 WL 7826650, at *3 (E.D. Tex. Sept. 12, 2016) (explaining that "the Fifth Circuit has not yet addressed the issue of whether a plaintiff is required to make a threshold showing of trademark use"), nor has the Fifth Circuit addressed how "use in commerce" is satisfied in cases where the trademarked good is repaired or modified at the consumer's request rather than being sold on the open market to public consumers, see Metropcs Wireless, Inc. v. Virgin Mobile USA, L.P., No. 3:08-CV-1658-D, 2009 WL 3075205, at *4–5 (N.D. Tex. 2009).

At least one Circuit Court has addressed—albeit implicitly—the issue of whether "use in commerce" is as substantive element of a trademark infringement claim under the Lanham Act.  See Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc., 285 F.3d 848, 854–55 (9th Cir. 2002).  While relying

predominately on the Supreme Court's holding in <u>Champion</u>, the Ninth Circuit in

<u>Karl Storz</u> explained that the Lanham Act can apply to repaired or modified

trademarked goods when the goods have been repaired or modified to such an

extent that the repair company "trad[es] on the goodwill of, or association with, the

trademark holder[,]" such that a "use in commerce" of the trademark has resulted.

285 F.3d at 856.  While "[t]here is no brightline test for determining whether a

company that repairs or reconstructs goods and retains the original manufacturer's

trademark on the goods is using the trademark in commerce[,]" the Ninth Circuit

set out four factors to aide in the determination.  <u>Id.</u> at 856–57.  "Those factors

include [(1)] the nature and extent of the alterations, [(2)] the nature of the device

and how it is designed (whether some components have a shorter useful life than

the whole), [(3)] whether a market has developed for service and spare parts, and,

most importantly, [(4)] whether end users of the product are likely to be misled as

to the party responsible for the composition of the product."  <u>Id.</u> at 857 (internal

quotations omitted).

    Assuming without deciding that "use in commerce" is a

necessary element of Plaintiffs' trademark infringement claim under the Lanham

Act, the Court finds that Plaintiffs have sufficiently shown, based on the factors

above, that the centrifuges were altered to such an extent that the Hematastat-II

mark was "use[d] in commerce."

a.      Nature and Extent of the Alteration

As to the first factor—the nature and extent of the alterations—

Plaintiffs have sufficiently shown that Defendant did not merely repair the

trademarked centrifuges at the customers' request, but instead actually replaced

some essential parts of the machine with unoriginal parts, which Plaintiffs argue

changed how the machine functioned.  (Dkt. # 20 at 3–4, 6; Dkt. # 35 at 6.)  Thus,

when considering the nature and extent of the alterations, it appears the alterations

are not merely repairs, as Defendant contends, but rather material modifications or

rebuilds.  For example, Plaintiffs contend that the modified centrifuges differ from

the original Hematastat-II centrifuges in several "vital ways," namely: (1) the

modified centrifuges "lack cooling vents in the housing assembly, thus causing the

motor to run at an increased temperature which affects both performance and

longevity" of the machines; (2) "there is no manual key release slot on the side" of

the modified centrifuges; and (3) "there is no membrane switch" on the modified

centrifuges.  (Dkt. # 20 at 6.)  In their supplemental briefing, Plaintiffs provide

evidence through old invoices that show Defendant's alleged repairs extended not

only to the machines' housings, but also to the centrifuges' motors, cables, and

other "essential parts."  (Dkt. # 30 at 6.)

Defendant argues it merely repairs the trademarked centrifuges and

that the machines are not altered to such an extent that they become new products

bearing Plaintiffs' trademark.  (Dkt. # 18 at 4, 6–7.)  In an attempt to show that its

work on the centrifuges does not result in a new product, Defendant analogizes this

case to other cases where courts have found the "use in commerce" element to be

lacking.  (Id. at 6.)  For example, Defendant relies on U.S. Surgical Corp. v. Orris,

Inc., 5 F. Supp. 2d 1201, 1209 (D. Kan. 1998), wherein the plaintiff sued the

defendant, arguing that the defendant's "process of cleaning, resterilizing, and

resharpening medical instruments constitute[d] trademark infringement."  5 F.

Supp. 2d at 1203.  The court granted summary judgment in favor of the accused

infringer-defendant because it found, *inter alia*, that the plaintiff had failed to show

that Orris used the trademarked instruments in commerce.  Id.  As part of its

analysis, the court explained that merely cleaning, resterilizing, and resharpening

the instruments did not result in a commercial conduct sufficient to "subject the

defendant to trademark liability."  Id. at 1209.  This case, however, is distinct from

U.S. Surgical Corp. because it is clear that Defendant's services go beyond basic

cleaning and repairing; instead, Defendant's services involve replacing original

parts with new parts that may cause the trademarked machine to function in a

materially different way.  For that reason, the Court finds that the first factor

weighs in favor of finding the mark was "use[d] in commerce."

26

b.       Nature of the Device and Its Design

As to the second factor—the nature of the device and how it was designed—Plaintiffs have sufficiently shown that the Hematastat-II is a functionally complex and sensitive medical device designed in accordance with precise specifications.  (See Dkt. # 30 at 7.)  Plaintiffs contend that their unique design differentiates the Hematastat-II centrifuge from any other centrifuge and that by altering the Hematastat-II's integral components—such as the housing, operational controls, and casing—Defendant has altered the functionality of the machine to the extent that a new product has effectively resulted.  (Id. at 7–8.)  In response, Defendant contends that it does not replace the internal components of the Hematastat-II; it only replaces the lid assembly, the housing assembly, and the markings of the outside of the device.  (Dkt. # 18 at 7.)  Consequently, Defendant argues that its modifications to the machine are not so extensive as to result in a new product.  (Id.)

At this stage of litigation, the Court need not make a determinative finding as to the extent of the modifications; rather, the Court need only find that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim.  In that regard, because Plaintiffs purportedly designed the Hematastat-II with a high degree of detail and in accordance with their specifications, it follows that any significant change to the trademarked machine

27

would likely materially alter the design.  Accordingly, the Court finds that the second Karl Storz factor tends to weigh in favor of finding the Hematastat-II mark was "use[d] in commerce."

c.      Likelihood of End Users Being Misled

As to the final Karl Storz factor—whether "end users" of the product are likely to be misled as to the party responsible for the composition of the product—the Court finds that Plaintiffs have sufficiently shown that end users are likely to be misled as to whether Plaintiffs are responsible for the composition of the modified machine rather than Intermountain.  In analyzing this factor, the first issue the Court must address is the proper scope of the term "end user."  Defendant contends that "end user" only pertains to the actual customers or agents on the laboratories' behalf who are requesting the modifications.  (Dkt. # 18 at 5.) Because the customer knows that Intermountain is making the repairs, Defendant argues that the customer cannot be misled as to the party responsible for the composition of the product.  (Id.)  In contrast, Plaintiffs assert that the scope of "end user" extends not only to the customers requesting modifications, but also to the "laboratory technicians using the hematocrit centrifuges" and "doctors interpreting the blood test results[.]"  (Dkt. # 35 at 9.)

The Ninth Circuit addressed the proper scope of "end user" in Karl Storz.  In Karl Storz, the plaintiff, a manufacturer of rigid endoscopes, sued

28

Surgical Technologies, Inc. ("Surgi-Tech"), a company that repaired endoscopes

and other medical equipment, for trademark infringement.  285 F.3d at 852.  As

part of its business model, Surgi-Tech received broken endoscopes directly from

hospitals and doctors, performed the repairs at the customers' request, and returned

the scopes to the customers who then paid the repair charges.  Id.  Surgi-Tech did

not label the trademarked product as "repaired" or "rebuilt" or otherwise identify

Surgi-Tech's work.  Id.

   Over a period of time, surgeons complained to Karl Storz's sales

representatives about the quality and performance of what the surgeons believed to

be original Storz endoscopes, but were in fact Storz endoscopes repaired or rebuilt

by third parties.  Id. at 853.  Due to the lack of markings, "Storz was not able to

determine whether it was Surgi-Tech, versus another repair company, that had

performed the repairs or rebuilds."  Id.

   After the plaintiff filed suit against Surgi-Tech, Surgi-Tech moved for

summary judgment on the Karl Storz's trademark infringement claim.  Id.  The

lower court granted in part and denied in part Surgi-Tech's motion for summary

judgment.  Karl Storz, 285 F.3d at 852.  The court denied Surgi-Tech's motion on

the issue of "whether Surgi-Tech's distribution of repair endoscopes to entities

other than original owners, such as third party dealers or other entities engaged in

purchasing and reselling endoscopes to the general public, violate[d] Storz's

trademark rights." Id.  And the court granted Surgi-Tech's motion on the grounds

that: (1) Karl Storz failed to raise a triable issue of material fact as to the likelihood

of confusion; and (2) the repair and refurbishment of an endoscope did "not

necessarily" constitute an unlawful "use in commerce" under the Lanham Act.  Id.

On appeal, the Ninth Circuit reversed the lower court's decision to

grant summary judgment on the issue of likelihood of confusion.  Id. at 854.  The

arguments raised on appeal were almost identical to the issues here: "Storz

argue[d] that once Surgi-Tech performed extensive reconstruction to a scope, the

source of that scope became Surgi-Tech, yet the Storz mark remained and

consumer confusion resulted."  Id.  Conversely, Surgi-Tech argued that "there

could be no confusion because the owner itself (the hospital) commissioned the

work and thus knew who performed it."  Id.  In reversing the lower court, the Ninth

Circuit held that Storz could rely on the concept of "post-sale confusion" as a

method of showing likelihood of confusion.  Karl Storz, 285 F.3d at 854.  The

Ninth Circuit noted that, in response to Surgi-Tech's motion for summary

judgment, "Storz submitted evidence of actual confusion on the part of surgeons as

to whether malfunctioning Storz endoscopes were original Storz scopes or had

been repaired or rebuilt by someone other than Storz."  Id.  Such evidence, the

Ninth Circuit found, was sufficient to raise a genuine issue of material fact

regarding the likelihood of confusion.  Id.

30

The Court finds the Ninth Circuit's reasoning in <u>Karl Storz</u> persuasive.  That holding, along with the Court's careful consideration of the other matters discussed herein, leads the Court to conclude that the proper scope of "end user" includes not only the party requesting the modifications, but also the party using the modified product.  <u>See also</u> <u>Sunsport Inc. v. Barclay Leisure Ltd.</u>, 984 F. Supp. 418, 422 (E.D. Va. 1997) (explaining there was a likelihood of confusion to the customer and end-user of tanning beds, even though the purchaser of the beds knew that original manufacturer had not sponsored or approved the upgrades, because the mark remained prominently displayed on the modified beds); <u>cf.</u> <u>Karl Storz Endoscopy-Am., Inc. v. Fiber Tech Med., Inc.</u>, 4 F. App'x 128, 2001 WL 94739 (4th Cir. Feb. 5, 2001) (coming to different result on similar facts, but likelihood of confusion as it related to the end-user was not before the court).

In support of their argument, Plaintiffs offer the affidavit of Raymond E. Love, the production manager at EKF, who testifies that "future laboratory technicians using or servicing [Hematastat-II] devices will be confused as to the origin of the necessary and integral parts of the machine" and "end users, such as doctors, and patients, will likely attribute any defects in the machine or blood testing results caused by non-genuine parts and Intermountain's reconstruction to Plaintiffs[.]"  (Dkt. # 35-1, Ex. A ¶ 14.)  This testimony, in addition to Plaintiffs' evidence that one of the laboratories that uses the Hematastat-II, CSL, confused a

modified Hematastat-II with an original Hematastat-II, demonstrates that end users are likely to be misled about who is responsible for the composition of the centrifuge.

The second issue the Court must consider as to this factor is whether the modified or altered trademarked product bears any identifying feature that would inform an end user that the product has in fact been modified by a party other than the original manufacturer. Defendant contends that end users are put on notice of its work because the trademarked machines it services are also marked with a label stating, "Recertified by Intermountain." (Dkt. # 18 ¶ 20.) Plaintiffs argue, however, that the term "recertified" has a particular meaning in the medical device industry and does not sufficiently put the end user on notice that original parts were modified or replaced with non-original parts. (Dkt. # 35-1 ¶ 14.) The Court finds Defendant's argument unavailing.

Curiously, Defendant cites to Nellcor Puritain Bennett, Inc. v. Med. Taping Sys., No. C-96-652-SI, 1996 WL 865817, at *3 (N.D. Cal. July 2, 1996), as support for its argument. However, Nellcor is factually distinguishable from the present case and tends to support Plaintiffs' position, i.e., that a label indicating the trademarked machine was merely "recertified" by Defendant does not go far enough. In Nellcor, the plaintiff manufactured and sold medical devices that monitored the level of oxygen in a patient's blood. Id. at *1. The device consisted

of a sensor, which was placed on the patient's finger, and a monitor that would receive the electronic signals from the sensor.  Id.  The sensors at issue were non-reusable, single-use sensors that were labeled with the "Nellcor" trademark.  Id.  The defendant, Medical Taping System ("MTS"), obtained the single-use Nellcor sensors from hospitals before the sensors were used, modified them to be reusable, and then returned the sensors to the hospital—all at the hospitals' request and at no charge.  Id.  Notably, MTS covered the Nellcor trademark on the modified sensor with a label that read "reusable" and attached a red sticker to the sensor's cord indicating that (1) Nellcor did not approve of the modification, (2) Nellcor did not bear responsibility for the modified product, and (3) MTS modified the product.  Id.  The sensors were also re-delivered to the hospitals in new MTS packaging.  Nellcor, 1996 WL 865817, at *1.

Nellcor sued MTS for trademark infringement and sought a preliminary injunction.  Id. at *2.  The court, relying on Champion, denied Nellcor's preliminary injunction because the plaintiff did not show a likelihood of confusion.  Id. at *3.  The court explained that because the modified sensors were not sold on the open market, there was no risk of confusion to unsuspecting customers.  Id.  Rather, the purchasing agents at the hospital requested the modifications and understood that "the product [was] no longer a Nellcor sensor as Nellcor manufactured it."  Id.  Further, there was no risk of post-sale or end-user

33

confusion because "the modified sensors [bore] a conspicuous red sticker stating

that the product [was] modified in a way not approved of by Nellcor."  Id.  This

fact was dispositive for the court because there was no longer any risk of confusion

to end-users, or those "'downstream' of the purchasing agents such as therapists

and nurses[,]" since MTS had affirmatively disassociated the modified sensors

from Nellcor.  Nellcor, 1996 WL 865817, at *3.

   Here, there is no affirmative disassociation.  The recertification label

is the only identifier to an end user that indicates Intermountain has come into

contact the machine.  Yet the recertification label fails to indicate: (1) the extent to

which, if at all, the machine was altered; (2) whether or not the original

manufacturer sponsored or approved of the modification; or (3) whether the

original manufacturer remained responsible for the machine.

   Because the Court looks not only to the party requesting the

modifications on the laboratories' behalf, but also to the party using the machine,

and since the altered machines do not affirmatively state the extent to which it

differs from an original Hematastat-II, Plaintiffs have shown that end users are

likely to be misled as to the party responsible for the composition of the product.

Accordingly, the Court finds that the fourth factor in Karl Storz strongly weighs in

favor of finding the machines were "use[d] in commerce."

When the trademarked product has been so altered that the substance of the transaction is a sale, and it would be misleading to sell the product without noting the alterations, the Ninth Circuit has indicated that an infringing party has effectively used the owner's trademark in commerce.  See Karl Storz, 285 F.3d at 856.  After balancing the relevant factors, the Court finds that Plaintiffs have sufficiently demonstrated for the purposes of this motion that Defendant materially altered the Hematastat-II and that it would be misleading to pass on the altered centrifuge with the Hematastat-II mark to customers and end users without conspicuously noting the alterations.  Plaintiffs have therefore shown that their trademark was used in commerce.

### 2.    Substantial Threat of Irreparable Harm

As to the second element to obtain a preliminary injunction, a plaintiff must demonstrate that a threat of irreparable harm exists if the injunction is not granted.  See Lindsay, 821 F.2d at 1107.  In cases where "a likelihood of confusion exists," such as the one here, some courts have presumed a threat of irreparable injury.  The Fifth Circuit, however, has called into question the permissibility of such a presumption and declined to reach the issue on multiple occasions.  See Emerald City Mgmt., L.L.C. v. Kahn, 624 F. App'x 223, 224 (5th Cir. 2015) ("We need not consider the validity of that presumption, however, because the record before us supports a finding or substantial threat of irreparable harm."); see also

Paulsson, 529 F.3d at 313 ("We have no need to decide whether a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case[.]").  Thus, this Court will not presume irreparable injury, but will instead proceed to consider on the facts whether Plaintiffs have demonstrated a threat of irreparable harm.

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages."  Janvey, 647 F.3d at 600 (citing Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B 1981); Parks v. Dunlop, 517 F.2d 785, 787 (5th Cir. 1975)).  Irreparable harm may also be shown where "there [is] a threat to the goodwill and value of the plaintiff's mark" due to the defendant's continued use of the mark while modifying the product associated with it.  See Paulsson, 529 F.3d at 313.  The harm results from "the plaintiff's lack of control over the quality of the defendant's good or services . . . regardless of the actual quality of those goods or services."  Quantum Fitness Corp., 83 F. Supp. 2d at 831; see also Emerald City Mgmt., L.L.C., 624 F. App'x at 223 (citing Re/Max N. Cent., Inc. v. Cook, 272 F.3d 424, 432 (7th Cir. 2001) ("The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods.")).

Plaintiffs argue that "[i]f Intermountain is not enjoined from its unlawful action, Plaintiffs will suffer irreparable harm to their reputation and loss

of the goodwill that they have developed through the success of their Hematastat-II mark." (Dkt. # 9 at 15.) In support of their argument, Plaintiffs offer the affidavit of Edward Hitchler, the General Manager of EKF, who testifies that: (1) Plaintiffs have not "authorized Intermountain [ ] to use the Hematastat-II mark or any variation thereof"; (2) Plaintiffs have no ability to control the quality of products or services provided by Intermountain and now marked with the Hematastat-II mark; (3) "Intermountain's unauthorized use of the Hematastat-II mark will likely cause confusion or deception because the public will be fraudulently led to believe that [Plaintiffs are] the source of the counterfeit parts of the hematocrit centrifuge marked in an unauthorized manner"; (4) Plaintiffs will suffer lost profits, irreparable injury to goodwill and reputation, and loss of business as a result of Intermountain's trademark infringement; and (5) "[i]t is difficult to measure in monetary amounts the potential damage that could be caused to [Plaintiffs] if Intermountain is allowed to continue infringing the Hematastat-II mark[.]" (Dkt. # 9-1, Ex. A ¶¶ 10–15.) Plaintiffs further explain that "[c]onsumers may blame Plaintiffs for defective parts or services provided by Intermountain as a result of Intermountain's unauthorized use of the Hematastat-II mark" and that such harm would also be impossible to cure with money damages. (Dkt. # 9 at 15.) For the purposes of the instant motion for preliminary injunction, Plaintiffs have clearly demonstrated a substantial likelihood of success on the merits.

Despite Plaintiffs' showing of irreparable harm, Defendant argues that a presumption of irreparable harm may be rebutted when a plaintiff is slow in seeking injunctive relief.  (Dkt. # 18 ¶ 24.)  Defendant asserts that "Plaintiffs knew of the alleged infringement as early as fall of 2017, yet took no steps at that time to address it or seek injunctive relief[,]" and waited "more than three months after discovering the alleged infringement" until filing suit.  (Id.)

While "[u]ndue delay in seeking a preliminary injunction tends to negate the contention that the feared harm will truly be irreparable," Embarcadero Techs., Inc. v. Redgate Software, Inc., No. 1:17-CV-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017), "delay will not negate a finding of irreparable harm where the plaintiff has a good explanation," Daily Instruments Corp. v. Heidt, 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014).  Courts generally deny injunctive relief for undue delay when a party has waited several months between discovering the harm and filing suit.  See AMID, Inc. v. Medic Alert Found. U.S., Inc., 241 F. Supp. 3d 788, 822 (S.D. Tex. 2017) (denying preliminary injunction for trademark infringement when plaintiff became aware of infringing displays as early as June 2015, but did not file suit until late April 2016 and then delayed the preliminary injunction hearing until several months later); Gonnanies, Inc. v. Goupair.com, Inc., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (denying preliminary injunction when plaintiffs waited six months before filing a motion for injunctive relief).

Here, Plaintiffs offer a sufficient explanation for the time it took them to file suit. Plaintiffs explain that it took time to "carefully inspect" the "first trademark-infringing product" and "determine where the counterfeit parts came from, the extent of the infringement, and the specific wrongdoer responsible." (Dkt. # 20 at 8.) Moreover, Plaintiffs "had to confirm whether or not this was a single instance of trademark infringement or any ongoing pattern of trademark infringement." (Id.) "The instant action was filed as soon as all material details were verified, approximately two months after the counterfeit parts were found on these hematocrit centrifuges." (Id. at 8–9.) The Court finds Plaintiffs' explanation to be sufficient. The two month-long delay between discovering the infringing activity and filing suit therefore does not militate against a finding of apparent urgency and irreparable harm.

3.     Balancing of the Equities

The third element for obtaining a preliminary injunction is whether the threatened injury to the movant outweighs any harm that may result from the injunction to the non-movant. See Lindsay, 821 F.2d at 1107. Courts in this Circuit have found that the balance of hardships weighs in favor of granting an injunction where the movant has presented evidence that it has invested considerable time, effort, and expense in promoting a mark. See, e.g., S & H

39

Indus., Inc. v. Selander, 932 F. Supp. 2d 754, 765 (N.D. Tex. 2013); Pro Hardware, Inc. v. Home Ctrs. of Am., Inc., 607 F. Supp. 146, 154–55 (S.D. Tex. 1984).

        Plaintiffs argue that they "suffer irreparable harm to their consumer goodwill and business reputation each day Intermountain infringes on their Hematastat-II mark" but that any "harm Intermountain will suffer . . . is both limited and self-inflicted." (Dkt. # 9 at 16.) "While Intermountain may incur some cost associated with recalling and rebranding the counterfeit parts marked with the Hematastat-II mark that Intermountain affixed to hematocrit centrifuges originally manufactured by Plaintiffs," Plaintiffs argue that "such cost[s] pale[ ] in comparison to the harm" Plaintiffs themselves have suffered. (Id. at 17.) Plaintiffs further allege that the infringement was willful, and thus the Court is not compelled to balance the hardships. (Id.) Defendant has not articulated or offered any evidence to show how it will be harmed by the preliminary injunction. Without such a showing, the Court finds that the equities in granting the preliminary injunction outweigh any harm to Defendant that may result.

        4.   Public Interest

        Finally, the Court considers whether issuing an injunction would undermine the public interest. See Lindsay, 821 F.2d at 1107. As correctly noted by Plaintiffs, "[t]he public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of

infringing marks." <u>Quantum Fitness Corp.</u>, 83 F. Supp. 2d at 832; <u>see also</u> <u>ADT,</u>

<u>LLC v. Capital Connect, Inc.</u>, 145 F. Supp. 3d 671, 700 (N.D. Tex. 2015) (same).

Accordingly, the Court finds that a preliminary injunction will not undermine the

public interest.

Because Plaintiffs have satisfied each of the four required elements

and have clearly shown that they are entitled to a preliminary injunction, the Court

finds that Plaintiffs' Motion for Preliminary Injunction should be—and is—

**GRANTED**.  (Dkt. # 9.)

II.     <u>Motion to Dismiss</u>

A.     <u>Legal Standard</u>

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a

complaint for "failure to state a claim upon which relief can be granted."  <u>See</u> Fed.

R. Civ. P. 12(b)(6).  In analyzing a motion to dismiss for failure to state a claim, the

court "accept[s] 'all well pleaded facts as true, viewing them in the light most

favorable to the plaintiff.'"  <u>United States ex rel. Vavra v. Kellogg Brown & Root,</u>

<u>Inc.</u>, 727 F.3d 343, 346 (5th Cir. 2013) (quoting <u>In re Katrina Canal Breaches</u>

<u>Litig.</u>, 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead

"enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp.</u>

<u>v. Twombly</u>, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S. at 556.)  The "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]"  Twombly, 550 U.S. at 555 (internal citations omitted).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plaint statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although the Rule 8 pleading standard does not require "detailed factual allegations," it does require more than "labels and conclusions."  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  "[A] formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.

In assessing a motion to dismiss under Rule 12(b)(6), the court's review is generally limited to the complaint and any documents attached to the motion to dismiss that are referred to in the complaint and are central to the plaintiff's claims.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); In re Katrina Canal Breaches Litig., 495 F.3d at 205.  The Court, however,

may also take judicial notice of public records under Federal Rule of Evidence 201 when considering a Rule 12(b)(6) motion.  <u>Funk v. Stryker Corp.</u>, 631 F.3d 777, 783 (5th Cir. 2011).

B.  <u>Analysis</u>

Plaintiffs contend that Defendant's Motion to Dismiss should be stricken from the docket because Defendant filed an answer before filing the instant Motion to Dismiss, and thus its motion is untimely under the Federal Rules of Civil Procedure.  (Dkt. # 16 at 2.)  A motion asserting any defenses under Rule 12(b) of the Federal Rules of Civil Procedure "must be made before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b).  Defendant filed its Motion to Dismiss after filing an answer to Plaintiffs' Complaint, and the motion is indeed untimely.  <u>See</u> <u>Jones v. Greninger</u>, 188 F.3d 322, 324 (5th Cir. 1999).

However, Rule 12(h)(2) provides that "[f]ailure to state a claim upon which relief can be granted . . . may be raised by: (B) a motion under Rule 12(c); or (C) at trial."  Fed. R. Civ. P. 12(h)(2).  Rule 12(c) motions, or motions for judgment on the pleadings, may be filed "[a]fter the pleadings are closed—but early enough not to delay trial[.]"  Fed. R. Civ. P. 12(c).  Thus, even though Defendant's Motion to Dismiss was untimely, the Court will construe the motion as a motion for judgment on the pleadings under Rule 12(c).  <u>Jones</u>, 188 F.2d 322 at 324 (finding the district court did not err when it "treated the appellees' motion to

43

dismiss for failure to state a claim, filed after the answer, as a motion for judgment

on the pleadings"); Bond St. Ltd., LLC v. Liess, No. 4:12-CV-755, 2014 WL

1287620, at *3 (E.D. Tex. Mar. 31, 2014) ("Regardless of how the motion is

characterized, this distinction does not affect the court's legal analysis because the

standards for motions under Rule 12(b)(6) and 12(c) are identical.") (internal

citations omitted).  Accordingly, Plaintiffs' Motion to Strike is denied.  (Dkt. # 16.)

Judgment on the pleadings is proper where there are no disputed

issues of fact and only questions of law remain.  Great Plains Trust Co. v. Morgan

Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002) (citing Voest-Alpine

Trading USA Corp. v. Bank of China, 142 F.3d 887, 891 (5th Cir. 1998) (internal

quotations omitted)).  "The standard for dismissal under Rule 12(c) is the same as

that for dismissal for failure to state a claim under Rule 12(b)(6)."  Johnson v.

Johnson, 385 F.3d 503, 529 (5th Cir. 2004).  Rule 12(b)(6) allows dismissal of a

claim if a plaintiff fails to state a claim upon which relief may be granted.  Fed. R.

Civ. P. 12(b)(6).  In analyzing a motion to dismiss for failure to state a claim, the

court must accept the complaint's well-pleaded facts as true and view them in the

light most favorable to the plaintiff.  Great Plains Trust Co., 313 F.3d at 312–13

(quoting Doe v. Hillsboro Indep. Sch. Dist., 81 F.3d 1395, 1401 (5th Cir. 1996)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough

facts to state a claim to relief that is plausible on its face."  Iqbal, 566 U.S. at 678

(quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Iqbal, 556 U.S. at 678).

Here, Defendant asserts that Plaintiffs' Complaint has failed to state a claim for trademark infringement.  (Dkt. # 14.)  Relying predominately on the same arguments raised in opposition to Plaintiffs' Motion for Preliminary Injunction, Defendant contends that Plaintiffs cannot state a claim for trademark infringement because (1) Plaintiffs cannot show that the Hematastat-II mark has been used in commerce (id. ¶¶ 13–14); (2) "the Lanham Act does not prohibit a company from specializing in the repair of trademarked goods" (id. ¶ 15); and (3) even if the Lanham Act did encompass the repair of trademarked goods, Plaintiffs have not alleged that the hematocrit centrifuges were so altered as to result in new product (id. ¶¶ 19–22).

As to Defendant's first argument, the Court has already addressed in depth that Plaintiffs have shown a likelihood of success on the merits of their trademark infringement claim, see supra, which includes the threshold showing of "use in commerce" under Section 1114.  Defendant's Motion to Dismiss is therefore denied on this ground.

Similarly, the Court has already explained that courts interpreting the Lanham Act have found that it "prohibit[s] a party from making changes in integral parts of a product and then selling the modified product under the original trademark without full disclosure."  Rolex Watch USA, Inc. v. Meece, 158 F.3d 816, 825 (5th Cir. 1998).  Such a prohibition is decidedly different than "prohibit[ing] a company from specializing in the repair of trademarked goods" as Defendant contends, but the Lanham Act nonetheless covers the types of acts Plaintiffs have alleged.

Finally, Defendant argues that even if the Court recognizes the Lanham Act's application to the instant case, Plaintiffs have not alleged that the hematocrit centrifuges were altered to such an extent that Defendant effectively created a new product and failed to remove the Hematastat-II mark or otherwise notify the consumer that the machine had been altered.  (Dkt. # 14 ¶¶ 19–22.)  In viewing the facts in Plaintiffs' Original Petition in the light most favorable to them, the Court finds that Plaintiffs have sufficiently set out how the modified hematocrit centrifuge materially differed from the original manufactured centrifuge.  (See Dkt. # 1-1 ¶¶ 13–15.)  Plaintiffs also alleged that Defendant kept the Hematastat-II mark on the materially altered machines, which caused and continues to cause confusion or deception among consumers and end-users.  (Id. ¶¶ 18, 23.)  In so doing, Plaintiffs have pleaded "enough facts to state a claim to relief that is plausible on

46

its face." <u>Twombly</u>, 550 U.S. at 570.  Accordingly, the Court denies Defendant's Motion to Dismiss.  (Dkt. # 14.)

CONCLUSION

As set forth above, the Court: (1) **GRANTS** Plaintiffs' Motion for Preliminary Injunction (Dkt. # 9); (2) **DENIES** Defendant's Motion to Dismiss (Dkt. # 14); and (3) **DENIES** Plaintiffs' Motion to Strike (Dkt. # 16).

As required by Federal Rule of Civil Procedure 65(c), the $2,500 bond that Plaintiffs posted for the previously issued Temporary Restraining Order (<u>see</u> Dkt. # 9) suffices to support the instant preliminary injunction.  A separate order of preliminary injunction, in conformity with this order, will be entered forthwith.

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, June 18, 2018.

_____

DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE